**In re PETER MERGENTHALER, Debtor.**

**Bankruptcy No. 087–70724–21.**

United States Bankruptcy Court, E.D. New York.

Feb. 21, 1992.

Peter Mergenthaler, pro se.

Alan Pressman, Central Islip, N.Y., for respondent.

L'Abbate & Balkan, Garden City, N.Y., for Alan Pressman.

Richard W. Meirowitz, pro se.

## DECISIONS ON SANCTIONS PURSUANT TO FED.R.BANKR.P. 9011

MARVIN A. HOLLAND, Bankruptcy Judge:

Richard W. Meirowitz filed a motion seeking to sanction the debtor, Peter Mergenthaler (hereinafter the "Debtor"), and his attorney, Alan Pressman (hereinafter "Pressman"), jointly and severally in the amount of $10,000.00 pursuant to 28 U.S.C. § 1927 and Fed.R.Bankr.P. 9011. We find for the movant and assess sanctions against both respondents pursuant to Fed. R.Bankr.P. 9011.

These proceedings are subject to bankruptcy court jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), 11 U.S.C. § 105(a) and the Order of Referral of Matters to Bankruptcy Judges for this District, 69 B.R. 186. These are core proceedings pursuant to the general language of 28 U.S.C. § 157(b)(2) as well as the specific language of 28 U.S.C. § 157(b)(2)(A) and (*O*). See also, *Chicago Bank of Commerce v. Amalgamated Trust and Savings Bank (In re Memorial Estates, Inc.)*, 132 B.R. 19 (N.D.Ill.1991).

## BACKGROUND

The underlying pre-petition background is not disputed. The movant, Mr. Meirowitz (hereinafter "Meirowitz"), is an attorney by profession who represented the Debtor in a number of matters. The representation appears to have been of the highest quality. Meirowitz had obtained very favorable results for the Debtor. (Tr. 11/21/88 at 126–131; Tr. 10/21/88 at 42–45). The Debtor however failed to pay the legal bills sent to him by Meirowitz. On January 6, 1986 Meirowitz obtained a judgment by confession against the Debtor. The judgment was for $61,479.31 and was entered in the office of the Clerk of the New York State Supreme Court, New York County. (Movant's Ex. A to Ex. 21 in evidence.)

After Meirowitz failed in his efforts to collect on the judgment he initiated enforcement proceedings. The proceedings were addressed against what appeared to be the Debtor's only substantial attachable asset—a parcel of real property located in East Hampton, New York and owned by the Debtor and his wife, Judith Mergenthaler (hereinafter "Judith"), as tenants by the entirety. Meirowitz arranged for a sheriff's sale to take place on June 23, 1987. Unfortunately, the property was subject to a foreclosure proceeding initiated by I.P.X. Construction Corp. (hereinafter "I.P.X."). Such foreclosure sale took place on June 17, 1987 when DAG Enterprises, Inc. (hereinafter "DAG") was the highest bidder. DAG, however, failed to close.

The Debtor then moved by an Order to Show Cause (hereinafter "OSC") before the New York State Supreme Court seeking to temporarily restrain Meirowitz from executing upon the judgment. The Debtor also filed an action seeking to set aside the judgment. The court declined to sign the OSC. Therefore, Meirowitz scheduled a sheriff's sale of the real property for August 11, 1987. That sale did not take place

in light of an OSC obtained on behalf of the Debtor from the New York State Supreme Court the day before. On August 13, 1987, however, the restraining order included in the OSC was vacated and the motion was denied.

Meirowitz then scheduled yet another sheriff's sale to take place on September 4, 1987. However, on September 2, 1987 the Debtor obtained another ex-parte OSC which temporarily blocked the sale. In oral argument held on September 3, 1987 the temporary restraining order was vacated paving the way for the sale to go forward the next day. The sale, however, did not take place. On September 4, 1987 the Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* The petition was filed Pro–Se.

On September 8, 1987 Meirowitz moved to dismiss the case and at the hearing held on September 20, 1987 the case was dismissed. An order to that effect was entered on October 13, 1987. Mr. Pressman moved by an OSC for a rehearing of the dismissal motion. The OSC was signed on October 14, 1987 but at the hearing scheduled for October 23, 1987 the court denied the application for a rehearing.

On the same date Mr. Pressman filed a voluntary petition under Chapter 13 of the Bankruptcy Code on behalf of Judith. It is not disputed that Pressman never met Judith, that he filed the petition on request of the Debtor, and that he relied solely on information and representation made to him by the Debtor. The Debtor even signed the petition on the place designated for Judith's signature.

The filing of the petition on behalf of Judith caused the cancellation of the scheduled sheriff's sale of Judith's interest in the real property. Furthermore, the sheriff refused to proceed to sell the Debtor's interest in the real property in light of Judith's filing. Judith's case was dismissed on May 27, 1988 for failure to appear at a confirmation hearing and to make the required payments. An order to that effect was entered on June 2, 1988.

On April 11, 1988 the Debtor filed another voluntary petition under Chapter 13 of the Bankruptcy Code (case no. 88–80308–21). In that case the court lifted the automatic stay and allowed the foreclosure sale of the real property to proceed. IPX proceeded with the foreclosure sale at which Meirowitz's wife purchased the real property for $250,000. On July 7, 1988 the case was dismissed since the Debtor did not qualify for relief under Chapter 13.

On September 18, 1990 the Debtor filed Pro–Se his third voluntary petition under Chapter 13 of the Bankruptcy Code (case no. 90–71395–21). On October 9, 1990 an order dismissing the case for failure to file a Chapter 13 statement and plan was entered.

Mr. Meirowitz moved to sanction the Debtor and Mr. Pressman in this case (case no. 87–70729–21) and Judith and Mr. Pressman in Judith's case (case no. 87–70852–21). The proceedings in Judith's case were adjourned pending the disposition of the motion filed in this case.

The motion seeks to sanction the Debtor and Mr. Pressman for a garden variety of violations pursuant to Fed.R.Bankr.P. 9011 and 28 U.S.C. § 1927.

## DISCUSSION

■ Mr. Pressman argued that this matter is defined as an adversary proceeding under Fed.R.Bankr.P. 7001. That is clearly not so. Nowhere could we find in Rule 7001 a definition of adversary proceeding that includes sanctions proceedings. Moreover, Rule 9011 specifically provides: "If a document is signed in violation of this rule, the court on *motion* or on its own initiative, shall impose ... appropriate sanctions." Fed.R.Bankr.P. 9011 (emphasis added).

### (A) The Controlling Legal Principles

In order to avoid repetition the court will briefly present the controlling legal principles based on which we find Rule 9011 to have been violated. Rule 9011 states:

"Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party

represented by an attorney ... shall be signed by at least one attorney of record ... A party who is not represented by an attorney shall sign all papers ... The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information or belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law ...; and that it is not interposed for any improper purpose, such as to harass, or to cause delay, or needless increase in the cost of litigation."

Fed.R.Bankr.P. 9011(a). See, generally, *Business Guide, Inc. v. Chromatic Communications Enterprises, Inc.,* — U.S. ——, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

■ Contrary to what seems to be the literal reading of the rule, it is well established that the rule is violated either when the pleading is frivolous *or* when it is interposed for an improper purpose. See, Wright & Miller, *Federal Practice and Procedure,* Civil 2d § 1335 at 58 (1990 & 1991 Supp.) and cases cited at n. 1; *Baker v. Latham Sparrowbush Associates (In re Cohoes Industrial Terminal, Inc.),* 931 F.2d 222, 227 (2d Cir.1991); *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1344 (2d Cir.1991).

■ It is the law of this Circuit that "[t]he standards for assessing the propriety of the signer's conduct under rule 11" is an objective standard. *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985).

Moreover, the objective standard is that of a reasonable inquiry by a competent attorney. *Eastway,* 762 F.2d at 254.

Thus, it is no longer enough for an attorney to claim that he acted in good faith or that he was personally unaware of the groundless nature of a fact stated in a submission which he signed. Without doubt, the Rule now imposes an affirmative duty on an attorney to reasonably inquire into the facts stated in a document signed by the attorney.

*In re Jerrels,* 133 B.R. 161, 164 (Bankr. M.D.Fla.1991).

■ Contrary to Mr. Pressman's argument, it is the law of this Circuit that a pleading need not be frivolous as a whole in order to subject its signer to Rule 11 sanctions. See, *Cross & Cross Properties v. Everett Allied Co.,* 886 F.2d 497 (2d Cir.1989). See also, *Townsend v. Holman Consulting Corp.,* 914 F.2d 1136 (9th Cir. 1990), *reh. denied, en banc,* 929 F.2d 1358 (9th Cir.1990).

■ In order to impose Rule 11 sanctions, however, there must exist a signed document. "Rule 11, perforce, cannot be invoked, unless some signed pleading, motion, or other paper is filed." *International Brotherhood of Teamsters,* 948 F.2d at 1344. The court however may sanction improper conduct, even when no signed paper is filed, pursuant to its inherent power. *International Brotherhood of Teamsters,* 948 F.2d at 1345.

The type of sanctions that the court may impose and the factors to be considered in imposing sanctions are summarized in *In re Omega Trust,* 110 B.R. 665 (Bankr. S.D.N.Y.1990), *aff'd in part, remanded in part,* 120 B.R. 265 (S.D.N.Y.1990).

(B) Debtor's Sanctionable Conduct

(i) *Credibility*

■ The Court of Appeals for this Circuit has established that in ruling on a motion for sanctions, the Court should resolve all doubts in favor of the signer. *Oliveri,* 803 F.2d at 1275; *Eastway,* 762 F.2d at 254. Therefore, the credibility of the Debtor's testimony is crucial in determining whether doubts exist.

Upon giving careful consideration to the testimony heard and review of the transcript, we are of the opinion that, for the most part, the Debtor's testimony is unbelievable.

As the testimony unfolded before us we learned that the Debtor will do whatever it takes in order to have his way. The Debtor is not reluctant to ignore the law and sometimes break the law, wherever it

meets his goals. In addition, we could not overlook his evasive answers to relatively straight-forward questions.

(a) The Debtor rented an apartment in a building located at 317 East 91 Street. The Debtor rented the apartment in his son's name, Peter Mergenthaler Jr. (hereinafter "Peter Jr.") and signed the lease on his son's behalf. (Tr. 8/11/88 at 64). However, when the managing agent brought an action for nonpayment of rent, the Debtor filed an order to show cause in which he identified himself as Peter Mergenthaler Jr. (Tr. 8/11/88 at 58, lines 20–21). Furthermore, in the "tenant's application for apartment rental" (movant's Ex. 35) the Debtor named his wife as a reference, using her maiden name, without disclosing that fact to the managing agent. (Tr. 8/11/88 at 63–64).

(b) The Debtor was held in contempt twice by the New York State Supreme Court and failed to pay the small amounts of fine imposed on him. See, movant's Ex. 61, Tr. 1/23/89 at 81–83. The Debtor's behavior, by his own admission, reveals total disrespect to the legal process:

Q. Have you paid me the fine that is set forth and required you to pay?

A. No, I haven't

Q. Can you tell me why not?

A. *I haven't gotten around to it.*

Tr. 1/23/89 at 81, lines 12–16 (emphasis added).

(c) The Debtor seems to be telling the truth only when he is compelled to do so.

Q. Is it not a fact also that you borrowed money from your good friend, Joel Steinberg?

A. I never borrowed money from Joel Steinberg.

Q. Are you quite certain?

A. I am positive of that.

Q. Are you absolutely certain that you never borrowed any money at any time from Joel Steinberg?

A. A ten dollar bill, that is all I can remember.

Q. Have you filed bankruptcy in the Southern District of New York many years ago, did you not sir?

A. Yes.

Q. Do you recall in connection with that filing that you prepared a schedule in which you listed a loan to Joel Steinberg in the amount of $4,102?

A. Yes, that is true.

\* \* \* \* \* \*

Q. Is it not a fact that you were discharged of your obligation to repay Joel Steinberg the $4,100 ...?

A. That is correct.

Tr. 10/21/88 at 41–42.

Q. Is it not a fact, sir, that you have stated to third parties that as a result of that representation [Meirowitz's representation of the Debtor] you received approximately $45,000?

A. I can't remember that as a fact.

Q. Do you ever recall having made the statement in writing, "Mortgage Holders Corporation that built the house, and I have been in litigation with for the past four years, mutually reached a stipulated settlement with my wife and I and this resulted in a savings to us of approximately $45,000." ....

A. I don't recall putting it in writing, no.

Q. Let me show you a letter that you sent sir ... please read that to the court aloud?

A. "Mortgage Holders Corporation that built the house and I have been in litigation for past four years, mutually reached stipulated settlement with my wife and I, resulting in saving for us of $45,000."

Q. Those are your words, correct, sir?

A. Yes.

Tr. 10/21/88 at 45–46.

The Debtor even admitted on the record to providing different versions on different occasions:

Q. Well, is it fair to state that you testified differently on each occasion?

A. That can be accurate, yes.

Tr. 10/21/88 at 81, lines 1–2.

(d) The Debtor does not appear to be inclined to pay the legal bills for services rendered to him by his lawyers. It is not

disputed that Meirowitz had to resort to legal proceedings in order to collect from the Debtor, it is not disputed that Mr. Pressman was not paid for services rendered by him in this case and the Debtor admitted that at least one other firm which provided him with legal services was not fully paid. See, Tr. 10/21/88 at 41, lines 4–6.

(e) The Debtor's checks appear to bounce on a regular basis. He does not hesitate to issue a check on an overdrawn bank account, and he freely issues stop orders to the bank after distributing checks. See, Tr. 10/21/88 at 33, lines 9–6; at 35 lines 15–17; at 36 lines 3–21; at 76 lines 20–25; at 77 (lines 18–end)—78 (Lines 1–11).

(f) On May 14, 1987 the Debtor filed a residential loan application form with the Dime Savings Bank of New York (Movant's Ex. 25). The form is signed by the Debtor. In response to specific questions regarding outstanding judgments and bankruptcies the Debtor stated that none existed. He does not dispute, however, that at least the judgment by confession obtained by Mr. Meirowitz in January, 1986 was outstanding against the Debtor and that he had previously filed for bankruptcy in the Southern District of New York in 1982 and received a discharge.

Furthermore, since the Debtor did mention in his loan application that IPX had an unpaid balance of $210,000 on its mortgage, the Dime sent a mortgage payment record release form to IPX. Dime produced the response received from IPX, signed by Ms. Dorothy Fragos, stating that the balance on the loan is $234,000 and that the present status of the loan is current. (Movant's Ex. 27; Tr. 8/11/88 at 17–19). As Ms. Fragos testified, however, she did not sign the document, and the information contained in the form was inaccurate since IPX had started foreclosure proceedings. See, Tr. 8/11/88 at 78–79.

The movant did not attempt to prove that the Debtor was in fact responsible for the forgery of the release form. We are aware that the circumstances proven may not be sufficient for a criminal indictment or conviction, but we are using it as one factor in a long line of factors that cast a dark shadow on the Debtor's credibility, reliability and moral character.

(ii) *False Statements in Affidavits*

(a) In paragraph 12 of an affidavit signed by the Debtor on September 21, 1987 and notarized by Mr. Pressman the Debtor stated: "My Chapter 13 plan has been duly submitted to this Court. I maintain that it is a viable, feasible plan submitted in good faith and it fully complies with all the requirements of Chapter 13 as set forth in the Bankruptcy Code."

It is not disputed that the plan was not filed at the time the affidavit was so sworn to. In fact, as a result of the dismissal of the case, a plan was never filed. We fail to see how it can be reasonably argued that these facts do not mandate, at a bare minimum, imposition of sanctions pursuant to Fed.Bankr.P. 9011. The statement was admittedly false when made. The Debtor was not even required to conduct a reasonable inquiry in order to determine its accuracy: the Debtor as the one who filed the voluntary petition pro-se positively knew that a Chapter 13 plan was not filed. If that is not a sanctionable conduct we do not know what is.

Moreover, during his testimony at this proceedings, the Debtor maintained that the said affidavit was true and accurate.

Q. Are all the statements in that affidavit true?

A. Yes.

Q. They are all true?

A. Yes, they are.

Q. Were they true when you affixed your signature?

A. Yes, they were.

Q. All right. Let me call your attention to paragraph 12 of your affidavit, which states in part and I quote, "my chapter 13 plan has been duly submitted to this court." Do you see that language?

A. Yes.

Q. Was that statement true, Mr. Mergenthaler?

A. No, it was not submitted to the court.

Q. So that statement was false?

A. I believe it was being prepared, yes.

Tr. 9/22/88 at 56–57.

Q. At the time that you swore to the contents of that affidavit, did you know what you meant when you were referring to your chapter 13 plan in paragraph 12 of that affidavit?

A. Yes.

\* \* \* \* \* \*

Q. ... Now, you know, did you not on September 21, 1987, you had not filed a plan with the Bankruptcy Court, is that not correct?

A. That is correct, sir.

Q. And yet you saw fit to swear to the statements in the affidavit ...

A. Correct.

Tr. 2/1/88 at 98–99.

(b) In paragraph 5 of Mr. Meirowitz's affidavit in support of his motion to dismiss the Debtor's case, Mr. Meirowitz states: "I further believe that Mergenthaler has placed assets in the names of third parties." The Debtor responded to this statement in paragraph 5 of his affidavit in support of cross-motion and opposition to the motion to dismiss. The Debtor stated: "Paragraph 5 of Mr. Meirowitz's affidavit amounts to an incredibly misleading statement for it is entirely untrue that I have placed my assets in the names of third parties."

The testimony presented, however, established that the Debtor indeed deposited funds in bank accounts managed under his son's name.

Q. Is it not a fact, Mr. Mergenthaler, that at that time you were depositing monies into an account in the name of your son, Peter Mergenthaler, Jr., which account was maintained at Intercounty Bank?

\* \* \* \* \* \*

A. My salary, yes.

Tr. 9/22/88 at 57, lines 16–23.

Q. Now, did you ever place any of your assets in the name of your son, Peter Mergenthaler, Jr.?

\* \* \* \* \* \*

A. Yes.

Q. And what assets might those be, sir?

A. The checks that I was receiving for consulting purposes to various corporations.

Q. What corporations are your referring to?

A. Specifically, Ash Corp.

Q. Any other corporations?

A. Not at this time.

Q. When you say, not at this time, we're talking about the period April of 1987 through roughly, December of 1987?

A. No I did not. Only Ash Corp.

Q. You put no other assets in your son's name other than those checks to you from Ash Corp.?

\* \* \* \* \* \*

A. Yes, I did.

Q. What other checks?

A. A loan I had received.

\* \* \* \* \* \*

Q. In what amount?

A. One for $35,000 from my brother.

Q. Yes?

A. Another one of $12,000 some odd dollars from ... a corporation....

Tr. 2/1/88 at 95–97.

(c) In paragraph 10 of the Debtor's affidavit in support of the OSC for a rehearing of the dismissal motion, he stated that if the dismissal decision is allowed to stand, the secured creditor will foreclose on the real property "as a result of which my wife and I will be out on the street."

The testimony showed, however, that at least with respect to the Debtor, that statement was not accurate. It was proven that the Debtor rented a studio apartment in Manhattan, though, under his son's name and that he was occupying it.

Q. ... Ms. Caiola, this affidavit is sworn to on October 12, 1987. At that time, to your knowledge, was Peter Mergenthaler, Senior [the Debtor] and/or Peter Mergenthaler, Jr. [the son] a tenant at the premises known as Apartment 6D at 317 East 91st Street?

A. Yes.

Tr. 8/11/88 at 61 lines 6–10.

Q. Did there come a time when the rent was paid for the premises?

A. Yes.

Q. As of what date?

A. August 1st, 1987.

Q. How long did the rent continue to be paid?

A. Until February of '88.

\* \* \* \* \* \*

Q. Now, during this time, to your knowledge, were the premises occupied? ...

A. Yes.

Q. To this day are they still occupied?

A. Yes.

Q. Who occupies the premises to this day, to your knowledge?

A. Peter Mergenthaler, Senior [the Debtor].

Tr. 8/11/88 at 57–58.

The Debtor's version of the facts regarding this apartment was left unsubstantiated and is not worthy of belief.

(d) In paragraph 8 of his affidavit in support of the OSC for rehearing the Debtor stated: "I pointed out that these actions on Mr. Meirowitz's part [Meirowitz's consistent collection efforts] meant that I did not have the necessary funds that I needed to retain an attorney to work up and complete and file the remaining schedules needed to complete my Chapter 13 bankruptcy petition."

This statement was totally false as the Debtor admitted in open court.

Q. When you told the court you didn't have enough money to draw up a plan, that was not so, was it?

A. No, it was not, sir.

Q. Isn't it a fact, Mr. Mergenthaler, that at the time you signed your name to this pile of paper you were in the process of depositing substantial sums of money into your son's account at the First Intercounty Bank ... in excess of $5,000 a month; is that not a fact?

A. That is true.

Tr. 9/22/88 at 89 lines 11–20.

(iii) *Filing a Chapter 13 Petition for an Improper Purpose*

(a) The Court of Appeals for this Circuit held that:

Generally, courts should conclude that a debtor has no demonstrable intent to reorganize only if, upon considering the *totality of the circumstances,* there is *substantial evidence* to indicate that the debtor made a bad faith filing.

*In re Cohoes,* 931 F.2d at 227 (emphasis added).

Using the totality of the circumstances and the substantial evidence tests, we conclude that the Debtor filed for protection under Chapter 13 twice, and both filings were an attempt to avoid foreclosure proceedings with no real intent to adjust his debts pursuant to Chapter 13 of the Bankruptcy Code.

As will be discussed in detail *infra,* the Debtor not only filed the petition in this case *pro-se* (Case No. 087–70724–21), but caused the petition in Judith's name to be filed (Case No. 087–70852–21). He met with Mr. Pressman who prepared and filed the petition in Judith's case, he provided the information to Mr. Pressman, and he even signed the petition on the place designated for the debtor's signature. Mr. Meirowitz argues that both filings were a bold attempt to delay his collection proceedings and were made with no real intent to reorganize pursuant to Chapter 13 of the Bankruptcy Code. We agree.

As was discussed *supra,* the Debtor's initial petition in bankruptcy was filed on the eve of a scheduled sheriff's sale. The petition was a "skeleton" petition and was clearly prepared in great haste. It did not include a plan and the list of creditors included only their identification, but did not include the debts owed and the status of such debts as being disputed, contingent or unliquidated. The filing occurred just after a New York State Supreme Court Justice vacated a temporary restraining order blocking the sale from going forward. The vacature of the order was just another

unsuccessful attempt by the Debtor to block Mr. Meirowitz's collection proceedings. It appears that only when the Debtor understood that he would not be able to block the sale from going forward, he switched the focus of his attempts from the state court to this court.

■ (b) We are aware that, as a general rule, hindsight should not be used in order to determine sanctionability. In this case, however, future occurrences serve to support our conclusion that the Debtor's filings were bad faith filings.

The Debtor's petition in this case was filed on September 4, 1987 and was dismissed only 24 days afterwards on September 28, 1987. The petition in Judith's case, filed under the signature and instruction of the Debtor, was filed on October 23, 1987, the return date for the Debtor's OSC for a rehearing of the dismissal motion. Judith's case was dismissed as well on February 23, 1988 for failure to appear at the confirmation hearing and to make the payments required pursuant to the provisions of Chapter 13 of the Bankruptcy Code. On April 11, 1988 the Debtor filed his second petition in bankruptcy which was dismissed less than three months later since the Debtor was not eligible to file under Chapter 13. On September 18, 1990 the Debtor filed his third petition in bankruptcy, which was dismissed a short time thereafter, on October 9, 1990 for failure to file chapter 13 statement and plan.

The court takes judicial notice that, for the most part, a Chapter 13 plan is a relatively simple document, preparation of which does not require a substantial amount of expertise, effort or time. Indeed many such plans are filed by uneducated pro-se debtors. The court further notes that all three petitions were dismissed based on procedural grounds for the Debtor did not even attempt to comply with the obligations imposed on a debtor in bankruptcy. In light of such behavior we can only conclude that the Debtor filed or caused the petition to be filed for the improper purpose of obtaining an immediate and temporary relief from legal process with no intent to go through the bankruptcy process.

(c) Only in rare cases, if at all, a debtor will admit in open court that he or she filed a petition in bankruptcy just to take advantage of the automatic stay. 11 U.S.C. § 362. The Debtor herein is not an exception. Some of his statements, however, may indicate that such was his intention.

Q. Did Mr. Pressman and you discuss why you were filing a petition in bankruptcy for and on behalf of your wife, Judith Mergenthaler, at that point in time?

A. That is what I was advised to do.

Q. Is it not a fact, Mr. Mergenthaler, that you knew that the stay ... was about to be brought to an end and you wanted to perpetuate the stay by filing a petition borne by your wife; isn't that what you wanted to accomplish? You wanted to perpetuate the stay?

A. *I can't answer that question in yes or no answer. I can't.*

Tr. 9/22/88 at 98–99 (emphasis added).

We believe that a yes or no answer would have been perfectly possible had the Debtor acted and testified honestly, truthfully and in good faith.

Q. Now, on September 4, 1987, you filed a skeleton Chapter 13 petition; is that correct?

A. That is correct.

\* \* \* \* \* \*

Q. Now, what prompted you to file a Chapter 13 petition at that time?

A. I was represented by two attorneys in New York who were embroiled in some work against Mr. Meirowitz, a Mr. Murray Lausch and associate, Harry Nickolie ... We were denied our motion to show cause. This was very late in the afternoon that I heard about it. I was in the Cordam office on 58th Street. We were trying to come up with a solution. Murray had to go out of town. Harry could not be found.

I frankly didn't know what to do. *I was sitting there with a bottle of*

*scotch trying to come up with a solution ...*

\* \* \* \* \* \*

Q. Were you motivated at least in part to save your house? Was that part of your motivation for filing the Chapter 13 bankruptcy petition?

A. *That was probably my main motivation ...*

Tr. 9/22/88 at 122–123 (emphasis added).

(d) No one can better attest to the Debtor's real intent in utilizing the bankruptcy process than his own bankruptcy attorney. In paragraphs 8 and 9 of an affidavit Mr. Pressman signed in support of his motion to be relieved as counsel in Judith's case, he stated:

"8. I am the unfortunate victim of a *con game.* Mr. Mergenthaler has quite cleverly hoodwinked me into filing his wife's bankruptcy case for himself and his wife, based on an endless series of false promises and *false representations* which I, in a sincere effort to assist a person in apparent great difficulty, quite naively believed. *I believe that I have suffered enough at the hands of Mr. Mergenthaler and his far reaching con-game ...* The image and speech which he [the Debtor] projected made it easy to accept his words as true and accurate. However, *little would have been further from the truth.*

9. I was suckered into the midst of a mess ... I regret that I permitted Mr. Mergenthaler's smooth talk, promises and assurances to *snooker me into getting involved in he and his his wife's financial quagmire.*" (emphasis added).

**(C) Pressman's Sanctionable Conduct**

**(i) *False Declaration***

■ At the bottom of the voluntary petition filed under Judith's name, Mr. Pressman signed the following declaration: "I, Alan Pressman, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that he or she may proceed under chapter 7 or 13 of title 11, United States Code, and have explained the relief available under each chapter." It is not disputed that the declaration is false. Mr. Pressman never met with Judith, never spoke with her over the telephone, and never advised her of anything. Mr. Pressman acted pursuant to instructions given to him by the Debtor who assured him that he is acting pursuant to his wife's wishes, who has some mental problems and therefore cannot appear in person. See, Tr. 11/21/88 at 20–21; at 70; at 105–107.

Mr. Pressman however argues that he communicated with Judith through her husband, the Debtor, and since the declaration does not state that he informed her personally, the declaration is not false. That position is untenable and the court rejects it outright.

It is not surprising that although the memorandum of law submitted on behalf of Mr. Pressman holds 81 pages, when addressing this issue it states: "There have been no cases cited to this court, and we know of none, which hold that proceeding in this manner was improper. Thus, we submit that, absent authority to the contrary, the activity should not be sanctionable." (Resp. Post–Hearing Memo at 74).

The language of the declaration signed by Mr. Pressman is straightforward, unambiguous and clear: Mr. Pressman certified that he informed the petitioner of her rights, i.e., Judith, while he did not. He informed the petitioner's husband, the Debtor herein, of his wife's rights and relied on the husband's representations that the information would be communicated to the wife. What Mr. Pressman did, and what he certified he had done, are clearly different.

We do not need any precedent in order to hold that Mr. Pressman's conduct herein is sanctionable. We think it was incumbent upon Mr. Pressman to provide precedents to the contrary. In any event, we adopt the position of *In re Jerrels*, 133 B.R. 161 (Bankr.M.D.Fla.1991) which sanctioned an attorney for similar conduct.

While Mr. Pressman argued that this aspect of his behavior should be more properly addressed in the motion brought in Judith's case, Meirowitz stressed that Ju-

dith's filing was part of a bold and comprehensive attempt to frustrate his collection efforts. The court, therefore, allowed the parties to present their evidence and arguments on this issue.

In light of the uncontroverted evidence reviewed above, while Mr. Pressman's position may be technically correct, it is at worst a harmless error which must be ignored, and at best a means of avoiding an additional protracted hearing in the Judith Mergenthaler case which would produce the same result. *See*, Fed.R.Bankr.P. 9005; Fed.R.Civ.P. 61.

### (ii) *Misstatements and Misrepresentations*

 Most of the papers that are subject to this proceeding were signed by the Debtor and notarized by Mr. Pressman. However, since Mr. Pressman did not sign the papers as attorney, they cannot be the basis to sanction him pursuant to Rule 11. In addition, we do not think that 28 U.S.C. § 1927 is applicable since Mr. Pressman's conduct did not serve to "so multiply the proceedings." We further believe that Mr. Pressman's conduct is not subject to sanctions pursuant to the court's inherent power to sanction bad faith conduct. *Chambers v. Nasco, Inc.*, — U.S. —, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), *reh. denied* — U.S. —, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991).

The record is filled with inaccurate and misleading statements contained in the affidavits signed by the Debtor, some of which were discussed *supra*. It is not disputed that Mr. Pressman drafted the affidavits for the Debtor's signature and caused them to be filed with the court, attached to notices of motions that carry his firm's name and address. See, docket # 4; # 9. Furthermore, in oral arguments before this court Mr. Pressman stressed the same positions advanced in the affidavits signed by the Debtor. In that, Mr. Pressman adopted these positions and offered them to the court as true and accurate. These positions and statements were not only false and misleading, but Mr. Pressman knew, or should have known, their true nature. Mr. Pressman had blindly followed the Debtor's representations although they were easily verifiable. Mr. Meirowitz, however, failed to show what is required in this Circuit in order to sanction an attorney pursuant to the court's inherent powers. Mr. Meirowitz clearly showed that Mr. Pressman's conduct failed to meet the minimal standard required of professional attorneys. He did not prove, however, subjective bad faith on Mr. Pressman's behalf.

As the Supreme Court held, the court's inherent powers "are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962)." *Chambers*, — U.S. at —, 111 S.Ct. at 2132. The conduct that is subject to the court's inherent powers is one which "abuses the judicial process", *Chambers*, — U.S. at —, 111 S.Ct. at 2133, and "the party may be sanctioned for abuses of process occurring beyond the courtroom", *Chambers*, — U.S. at —, 111 S.Ct. at 2139.

When dealing with impositions of sanctions pursuant to the court's inherent power, there needs to be a showing that the sanctioned person "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *Chambers*, — U.S. at —, 111 S.Ct. at 2133 (citations omitted) and that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion", *Chambers*, — U.S. at —, 111 S.Ct. at 2132. The Court of Appeals for this Circuit stated that "as we made clear in *Oliveri*, this Court recognizing the need for restraint, has always required a particularized showing of bad faith to justify the use of the court's inherent power: '[w]e have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of [the] lower courts.'"

*United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2d Cir.1991). We believe that the facts of this case do not meet the high standard established in this Circuit.

#### (D) Amount of Sanctions

 In his motion papers Mr. Meirowitz sought the imposition of $10,000 as sanctions against both the Debtor and Mr. Pressman. We believe that in the circumstances of this case imposition of that amount of sanctions is reasonable. We further hold that the Debtor and Mr. Pressman are liable jointly and severally for $2,000 while the Debtor alone is liable for an additional $8,000.

Mr. Meirowitz testified that he expanded 46.6 hours in dealing with the Debtor's filings exclusive of time spent regarding the actual sanctions proceeding. See, Tr. 1/23/89 at 63. After some discussion, the total number of hours was reduced to 38.1 hours. See, Tr. at 1/23/89 at 65. Mr. Meirowitz testified that his usual billing rate is $250 an hour which was not proven to be excessive. See, Tr. 11/21/88. Therefore, even without taking into account the sanctions proceeding, that involved ten hearings and hundreds of pages of transcript, Mr. Meirowitz is entitled to $9,525.00. Therefore, even without taking into account a punitive measure, we believe that the entire amount asked by Mr. Meirowitz is reasonable.

Based on the facts as presented heretofore, it is clear that the Debtor carries the main responsibility for Mr. Meirowitz's expenses. We believe that Mr. Pressman should be held accountable for 20% of the sum awarded in light of his false declaration, a declaration that brought about an improper filing, allegedly on behalf of the Debtor's wife, at a very sensitive juncture of this case. Unfortunately, Mr. Pressman refused to acknowledge that wrongdoing and up and until the very end insisted that his declaration was true, accurate, and not in violation of Rule 11. For that alone he is liable for the amount assessed against him herein.

### CONCLUSION

We find both the Debtor and Mr. Pressman subject to sanctions pursuant to Fed. R.Bankr.P. 9011. The Debtor and Mr. Pressman are liable, jointly and severally, for $2,000. The debtor alone is liable for an additional $8,000.

Settle an order in accordance with the foregoing, pursuant to Local Rule 29.