**In re WPRV–TV, INC., Debtor,**

**Ponce Federal Bank, F.S.B., Appellant.**

**In the Matter of WPRV–TV, INC., Debtor,**

**Puerto Rico Family Channel, Inc., Appellant.**

**Nos. 92–1081, 92–1229.**

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1992.

Decided Jan. 6, 1993.

---

Charles A. Cuprill–Hernandez, Ponce, PR, for appellant Ponce Federal Bank, F.S.B.

Carlos A. Piovanetti Rivera, Hato Rey, PR, for appellant Puerto Rico Family Channel, Inc.

Orlando Fernandez, with whom Edgardo Munoz, John Garcia, and Garcia & Fernandez, Hato Rey, PR, were on brief for trustee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In these consolidated appeals, each appellant, Ponce Federal Bank, F.S.B. ("Ponce") and Puerto Rico Family Channel, Inc. ("PRFC"), claims a legal entitlement to purchase debtor in bankruptcy WPRV–TV, Inc. ("WPRV" or "debtor"). After much legal wrangling, the district court[1] denied both suitors. With the exception of one

issue, we affirm the district court's rulings.[2]

## I.
## PRIOR PROCEEDINGS

On December 3, 1987, WPRV, a television station operating on channel 13 in Puerto Rico, filed a Chapter 11 voluntary petition for reorganization in the United States Bankruptcy Court for the Eastern District of Oklahoma.[3] On April 4, 1988, Ponce filed a proof of claim for the principal amount of $4,952,071. Ponce's claim was based on funds advanced under five promissory notes which were guaranteed by real estate and chattel mortgages on much of debtor's estate.[4] By June 1989, with prospects for reorganization at a nadir, and pressure from creditors and lienholders mounting, the Oklahoma bankruptcy judge, *sua sponte*, converted the case to one under Chapter 7. The case was then transferred to the District of Puerto Rico because the majority of the assets relevant to the case were present there. Contemporaneous with the transfer, Evangelina Vives was appointed operating and liquidating trustee of debtor's assets. Pursuant to 11 U.S.C. § 721, Vives was given authority to operate the station until July 31, 1989. This authority was subsequently extended and continues through the present time, although at this juncture it appears the station is off the air. The trustee assumed the administrative responsibilities of WPRV, maintaining it in operation ostensibly to preserve its Federal Communications Commission ("FCC") transmission license and thus its value as a going concern.[5]

---

1. During the course of the proceedings below, Bankruptcy Court Judge Lamoutte, to whom this case was originally assigned, recused himself. *See infra* p. 338. The district's other bankruptcy judge was unavailable, and the case was transferred to the district court.

2. We have previously held that when a district judge is sitting in lieu of recused bankruptcy judges, he is thereby exercising the district court's original jurisdiction over bankruptcy cases, rather than sitting as a temporary member of the bankruptcy court. An appeal, therefore, properly lies with this court, pursuant to 28 U.S.C. § 1291. *In Re Plaza De Diego Shopping Ctr., Inc.,* 911 F.2d 820, 824–25 (1st Cir. 1990) (citing *In Re Manoa Finance Co., Inc.,* 781

F.2d 1370 (9th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)).

3. According to scant references in the record, the Oklahoma court was chosen for WPRV's bankruptcy proceedings because its financial records were kept there.

4. The parties dispute whether, and to what extent, Ponce's claim is actually secured. As will be shown, *infra,* Part II. B., we need not resolve that issue. Nor is it necessary for us to address the district court's valuation of Ponce's claim.

5. According to statements in the record, if the station had remained off the air for a significant

On August 8, 1991, the trustee filed an "informative motion" reporting that all efforts to sell WPRV through a direct, private sale had failed and that all prospective offers had been withdrawn. Accordingly, she indicated her intent to sell the station at public auction. To that end, on September 10, 1991, the trustee filed a notice of intent to sell WPRV as a going concern at an auction to be held on September 30, 1991. The notice also indicated that a hearing to confirm the auction sale would occur on October 11, 1991.

Responding to the notice of the auction sale and the accompanying bidding instructions, Ponce delivered its sealed bid to the trustee, along with the required $150,000 deposit, on September 25, 1991, the deadline for such submissions. The bid totalled $4.85 million, consisting of Ponce's allegedly secured debt of $4.8 million, plus $50,000 cash. In addition to Ponce, two other bidders, neither of whom had submitted a prior written bid or deposit—both of which were required by the bidding instructions—appeared at the September 30, 1991, auction and bid $1.095 million and $4.055 million, respectively.

Despite the fact that Ponce was the apparent high bidder, the trustee did not immediately recommend sale of the station to it. Rather, the trustee announced that she would continue accepting offers until the date of the confirmation hearing. On October 4, 1991, Ponce challenged her action by filing a "Motion Requesting Order To Show Cause Why The Option (sic) Held On September 30, 1991, Should Not Be Adjudicated To Ponce Federal Bank And To Set Aside All Other Bids Received Contrary To Bidding Instructions."

On October 11, 1991, Bankruptcy Judge Lamoutte, prior to conducting the scheduled hearing and ruling on Ponce's motion, recused himself based on information received in a sealed motion filed by the trustee the previous day.[6] The case was then, as noted previously, transferred to the district court, which eventually rescheduled the confirmation hearing to November 12, 1991. Prior to that hearing, however, on October 24, 1991, the trustee filed a motion for authority to sell certain property of the estate free and clear of liens, with the existing liens attaching immediately to the proceeds of the sale in order to protect the equipment and property interests of the lienholders. See 11 U.S.C.A. § 363(f)(3), (5) (West 1979 & Supp.1992). Simultaneously, the trustee filed a notice of private sale, recommending a sale to PRFC, whose representative, Gonzalez Chacon, had already tendered a $100,000 earnest deposit towards the total proposed sale price of $4.835 million.[7] The notice of sale itemized

---

length of time, a strong possibility existed that the FCC would revoke its transmission license, resulting in a drop in the station's value. As the record contains no dispute as to the accuracy of this scenario, we accept it without extensive explication of federal communication law.

6. The trustee's motion, simply captioned "Motion Under Seal," was later unsealed by the district court. It was accompanied by sworn statements from three men—Norman Gonzalez Chacon, Federico Rivera Saez and Edwin Alfredo Gonzalez Rivera—who were involved in PRFC's aborted attempt to purchase WPRV with an auction bid of $6 million. The gist of the statements was that prior to the auction, affiant Gonzalez Chacon contacted Ponce to discuss the possibility of Ponce financing a PRFC bid up to the amount of Ponce's debt with WPRV. According to Gonzalez Chacon, a Ponce representative dissuaded him from attending the auction, ostensibly for the reason that his presence might unintentionally force the bidding higher than necessary. Gonzalez Chacon claims he was also assured that Ponce would represent

PRFC's interests at the auction. When all the bids were lower than that contemplated by Gonzalez Chacon, he went back to Ponce, feeling that PRFC's interests had not been protected. Gonzalez Chacon reported that he was then told by a Ponce representative that Ponce was not going to allow anyone but itself to buy WPRV and "that if he were me, he would not interfere in this matter because I would lose my money, because the bank would challenge any award." He also detailed threats against the professional reputation of the trustee.

After unsealing the motion two months later, the district court referred its contents to the United States Attorney's office for investigation as to possible criminal misconduct.

7. According to the trustee, Gonzalez Chacon and Rivera Saez originally expressed an interest in purchasing WPRV prior to the auction, and were given the bidding instructions and a sample Asset Purchase Agreement (APA). Following the auction, which they did not attend, see supra note 6, negotiations concerning a private sale to PRFC began, culminating in the PRFC offer.

the total price into four categories: real property ($2 million); equipment subject to Ponce's liens ($280,500); all other estate-owned equipment ($300,000); and going concern value ($2.25 million).

At the November 12, 1991, hearing, Ponce[8] objected to the PRFC sale for a number of reasons, including the fact that it still believed that it was entitled to purchase the station as a result of its—and no one else's—compliance with the auction procedures. Ponce stated, however, that it would not object to the PRFC sale provided that it was made for all of the debtor's estate and not on an itemized basis. Finally, Ponce stated that if the itemized sale were to proceed, it would bid $2 million of its claimed secured debt for the equipment subject to its lien which had been itemized on the notice of private sale at a value of only $280,000. A PRFC representative testified that if Ponce were allowed to purchase the equipment at issue, which included transmission towers vital to the station's operation, it would withdraw its bid entirely. The trustee testified that the proposed sale did not include all of the assets encumbered by Ponce liens, and that a large part of the Ponce collateral was not being sold. Finally, the trustee urged acceptance of the PRFC bid because—by bringing in over four million dollars in cash—the bid would realize the biggest benefit to the estate and creditors as a whole. In contrast, the Ponce bid included just over two thousand dollars in cash, with the rest represented by its credit claim, the actual value of which the trustee disputed. *See supra* note 4.

Following the hearing, the district court orally confirmed the sale to PRFC, overruled Ponce's objection to same, and denied Ponce's show cause motion addressed to the conduct of the auction. The judgment from which Ponce now appeals was entered December 18, 1991. 143 B.R. 315 As relevant events continued to occur after the confirmation, we defer discussion of Ponce's appeal until a more complete background picture has been sketched.

Shortly after the district court's approval of the sale to PRFC, a multifaceted dispute developed between the trustee and PRFC, grounded on disagreements as to the terms of the sale, the trustee's inability to determine the identity of PRFC's principals, and PRFC's apparent inability to demonstrate satisfactorily its financial ability. Armed with these concerns, and following several failed closing attempts, the trustee notified PRFC's attorney by letter dated December 13, 1991, that she was cancelling the negotiations and forfeiting PRFC's $100,000 deposit. Initially, both actions were purported to be taken pursuant to provisions of the auction bidding instructions requiring closing within thirty days of confirmation, which had taken place November 12, 1991.

The trustee claimed that prior to the time that PRFC made its purchase offer, the parties agreed that the terms of the APA and auction bidding instructions would control the sale. The parties had also agreed on certain changes to be made in the APA relative to deposit, down payment, and payment of operational expenses between the time of closing and FCC license transfer. After the confirmation, however, the trustee claimed that PRFC's attorney began attacking previously agreed-upon APA provisions.

Also troubling the trustee was the controversy concerning the identity of the parties with whom she was dealing. According to the trustee, Gonzalez Chacon and Rivera Saez indicated that PRFC had been incorporated, but during negotiations, the trustee learned that it was not. Moreover, while attorney Carlos Piovanetti apparently represented PRFC, one partner, Rivera Saez, claimed that Piovanetti did not represent him.

Finally, the trustee indicated that some of the proof of Gonzalez Chacon's financial worthiness had come from documents in the name of his son, Norman Gonzalez Rivera, which Gonzalez Chacon had represented as his own.

---

**8.** Only Ponce objected to the PRFC sale. Several creditors, on the other hand, testified in the sale's favor.

On December 20, 1991, responding to the trustee's actions, Gonzalez Chacon, on behalf of PRFC, filed a motion seeking return of the deposit and an order directing the trustee to negotiate with PRFC under court supervision.[9] Evidentiary hearings were held on January 21 and 27, 1992, following which the court entered an order vacating its prior confirmation of the PRFC sale, upholding the trustee's decision to forfeit the deposit, and allowing the trustee to resume her efforts to sell the station. PRFC appeals from that order.

## II.

## DISCUSSION

### A.   PRFC Appeal

In setting aside the PRFC sale, the district court endorsed the trustee's position, and found and ruled that PRFC had accepted the APA and bidding instructions prior to the trustee's recommendation of the sale, and had raised no objections to their terms until after the sale's confirmation. Thus, the court ruled, these terms became an integral part of the sale agreement between PRFC and the trustee, an agreement which led to the trustee's original sale recommendation. Because the bidding instructions required the purchaser to sign the APA within 30 days of confirmation— an event, obviously, which did not occur— the court held that the trustee's cancellation action was proper. In addition, based

on testimony presented at two hearings in January 1992, the court ruled that the trustee's concerns regarding possible misrepresentations on the part of PRFC as to the actual identities of those who would be in control of the station[10] as well as their financial capacity[11] were well-founded, and further militated in favor of vacating the confirmation. With respect to the deposit forfeiture, the court relied on a section of the bidding instructions which mandated automatic forfeiture in the event of an unconsummated sale. PRFC now claims that the district court erred in approving the trustee's action in terminating the sale and forfeiting the deposit.

■■■   As an initial matter, we note first the district court's relatively narrow range of discretion in determining to set aside its prior confirmation order. *Matter of Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir.1985). While the court has broad initial discretion in granting or denying confirmation, the court may vacate a prior order confirming a sale only in very limited circumstances in the exercise of its powers as a court of equity. *Id.* Following confirmation, a court may set aside the sale if "there was fraud, unfairness, or mistake in the conduct of the sale...." *M.R.R. Traders, Inc. v. Cave Atlantique, Inc.*, 788 F.2d 816, 818 (1st Cir.1986) (citation omitted); *see also Chung King*, 753 F.2d at 549–550 ("the existence of fraud, mistake or a like infirmity" would be necessary to vacate a

---

**9.** In fact, the record indicates that the trustee tried to negotiate with PRFC, even after the December 13, 1991, cancellation. Again, however, no agreement was reached.

**10.** As we have previously noted, the trustee became aware, after the confirmation of the sale, that PRFC was not incorporated, as she was led to believe it was. In fact, incorporation did not occur until after she cancelled the sale. As such, the purchase offer had been made by Gonzalez Chacon and Rivera Saez as equal partners, rather than by the corporation. Later, during the January hearings, it was revealed that Gonzalez Chacon was facing criminal charges in Puerto Rico. And, while Gonzalez Chacon maintained that he disassociated himself from PRFC, his signature appeared on documents dated January 28, 1992, that were later submitted to the court. The true identity and reputation of the buyer was especially relevant,

as the sale hinged on eventual transfer of WPRV's license to the purchaser, and the FCC considers such factors in its licensing decision. *See* 47 U.S.C.A. §§ 307–311 (West 1991).

**11.** As a result of the concerns created by the previously described discrepancy relating to the certificates of deposit, the district court ordered PRFC to present evidence of its finances at the second hearing, held on January 27, 1992. The only evidence presented was the testimony of Juan Ramon Guzman, who characterized himself as a "contact" for four alleged investors. Guzman, however, was unable to provide any details as to the finances of PRFC, Gonzalez Chacon, Rivera Saez, or any other investor. Instead, Guzman could testify only as to what he was told by the investors—a group of doctors— as to their interest and ability to purchase WPRV.

confirmed sale) (citing Bankruptcy Rule 9024, which applies Fed.R.Civ.P. 60 to bankruptcy cases, allowing judgments to be set aside for, *inter alia,* mistake, inadvertence, surprise, excusable neglect, fraud, misrepresentation or any reason justifying relief).

■ Such limited discretion is necessary, because " '[i]f parties are to be encouraged to bid at judicial sales there must be stability and a time must come when a fair bid is accepted and the proceedings are ended.' " *Id.* (quoting *In re Webcor,* 392 F.2d 893, 899 (7th Cir.), *cert. denied,* 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968)). "This policy of finality protects confirmed sales unless compelling equities outweigh the interests in finality." *Id.* (citations and internal quotes omitted); *In re F.A. Potts and Co., Inc.,* 86 B.R. 853 (Bankr.E.D.Pa.), *aff'd* 93 B.R. 62 (E.D.Pa.1988), *and aff'd without opinion,* 891 F.2d 280 (3rd Cir.1989) (finding of fraud or mistake not necessary when "compelling equities," including events subsequent to confirmation, outweigh finality goal).[12]

■ We agree with the district court that the shifting positions of PRFC with respect to its finances and the identity of its principals constituted circumstances sufficient to vacate the confirmation.[13] As noted above, it is the principle of finality which serves as the counterweight to the court's discretion. Here, given the uncertainty surrounding PRFC, that principle is outweighed by countervailing equities. Nor would the bankruptcy court's duty to preserve the value of the estate, *see M.R.R. Traders, Inc.,* 788 F.2d at 818, be fulfilled by a proposed sale to a party apparently unable to meet future financial obligations, and which might face additional obstacles in obtaining approval of the license transfer from the FCC. Thus, we conclude that

the district court's decision to vacate its confirmation of the PRFC sale was not an abuse of discretion.

■ In challenging the court's forfeiture decision, PRFC argues that the district court erred in finding that PRFC accepted the terms of the APA and its incorporation of both the bidding instructions and its forfeiture provision.

Our standard of review mandates that we accept the district court's findings unless they are clearly erroneous. *Malden Mills Industries, Inc. v. Ronald Alman,* 971 F.2d 768, 773 (1st Cir.1992); *In re Halmar Distributors, Inc.,* 968 F.2d 121, 129 (1st Cir.1992). *See also* Fed.R.Civ.P. 52(a); Bankr.R. 8013. Findings are not clearly erroneous unless "the reviewing court on the entire evidence is left with the firm and definite conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

As noted above, only the bidding instructions indicate that the deposit would be forfeited if the sale failed to materialize. The APA, on the other hand, refers to possible forfeiture only of a later down payment, equal to ten percent of the purchase price, but is silent with respect to forfeiture of the deposit at issue.

The district court, relying on the fact that PRFC had possession of both the APA and bidding instructions prior to the confirmation of the sale, ruled that both were a part of the sale agreement. We disagree. While the exact date that PRFC received the two documents is unclear, the trustee acknowledges furnishing them to PRFC prior to the original auction, a time frame not directly contradicted by PRFC. This is consistent with the position taken by PRFC that it was prepared to attend the auction but for the dissuasive representations

---

**12.** A "grossly inadequate" sale price is also an acceptable ground for vacating a sale, *see Chung King,* 753 F.2d at 550, but such ground is not a factor in this case.

**13.** Although the district court described the conduct of PRFC and its principals as fraudulent, we need not necessarily ascribe evil intent to PRFC in order to affirm the lower court's rul-

ing. Instead, we rest our conclusion on the "compelling equities" of the present situation. However, as noted *infra,* the district court's partial reliance on the thirty-day provision in the bidding instructions was erroneous. Given the other circumstances surrounding PRFC, this error does not affect our conclusion regarding the decision to vacate confirmation.

made by Ponce. *See supra* note 6. The trustee further stated that she provided PRFC with another set of the same documents following the auction in order to facilitate negotiations, and that the parties agreed that all those documents were part of the overall agreement to sell WPRV to PRFC. With respect to the APA and notice of sale, which ostensibly outlined the terms and contents of the private sale, the record supports the trustee's assertion. The bidding instructions, however, are another matter.

Simply put, there is nothing apparent from the face of bidding instructions, nor anything else in the record, from which one could conclude that the bidding instructions are anything more than that—general instructions related to bidding at the public auction. Many of the provisions contained therein are irrelevant to a private sale, including the timing and minimum amount of sealed bids. Several others differ from the terms of the APA, including the amount of the deposit and the time within which the buyer must apply for an FCC license.[14] Moreover, while the APA explicitly indicates that the terms of the notice of private sale are to become part of the APA, no similar mention is made of the bidding instructions. Finally, we note that the only evidence in the record of an agreement to incorporate is the trustee's oft-repeated statement that "the parties agreed" to incorporate the bidding instructions. Considering the above-described deficiencies, however, the lack of details or other evidence of such an incorporation agreement militates against incorporation. In sum, the district court's finding that the auction bidding instructions became part of the private sale agreement does not comport with the language of the instructions, the APA, or the circumstances surrounding a private

sale. Accordingly, we find that the district court's decision to uphold the forfeiture of the $100,000 is clearly erroneous and must be reversed.[15] Thus, PRFC is entitled, now that the proposed sale has been cancelled, to the return of its deposit.

### B. Ponce's Appeal

■ We note at the outset that Ponce's objection to the PRFC sale is now moot, as confirmation of the latter has been vacated. Ponce's only other argument is that it should be entitled to purchase WPRV because it was the successful bidder at the auction. We need look no further than the bidding instructions themselves to refute this claim. The instructions clearly state that the "trustee reserves the right to, in her sole discretion, ... (c) reject any or all bids." This statement plainly dovetails with the trustee's statutory role as the sole representative of the estate. 11 U.S.C. § 323. Here, where the Ponce bid would yield little benefit to the estate and other creditors, the trustee was well within her discretion in not recommending the Ponce bid for confirmation, and the court correctly denied Ponce's motion. *See In re Gil–Bern Indus. Inc.*, 526 F.2d 627, 628 (1st Cir.1975) ("It is hornbook law that if the highest bid submitted at a judicial· sale is manifestly inadequate, it need not be accepted."). Ponce, meanwhile, has cited no authority to the contrary.[16] The cases upon which Ponce relies vest some right in a potential purchase only *after* confirmation, when, as we have previously discussed, discretion to vacate confirmation is narrowed. *See, e.g., Chung King, Inc.*, 753 F.2d at 549; *In re F.A. Potts*, 86 B.R. at 858. Accordingly, we find no error in the district court's treatment of Ponce's objection.

---

**14.** The bidding instructions call for a $150,000 deposit and FCC filing within 30 days of confirmation. The APA reflects a $100,000 deposit and mandates FCC filing within 15 days of executing the APA.

**15.** Because we reverse the district court's forfeiture decision based on the "incorporation" issue, we need not address PRFC's argument that the trustee's Notice of Private Sale was legally deficient.

**16.** We note our displeasure with Ponce's decision instead to devote a significant portion of its appellate brief to hurling invectives at the trustee. The debtor in this case has been in bankruptcy purgatory for over five years. Given this unfortunate situation, Ponce's appellate style does little to aid us in unsnarling this legal tangle.

## III

### CONCLUSION

For the reasons stated herein, the judgments of the district court are *affirmed in part,* and *reversed in part.* Each side to bear its own costs. The papers in the case are remitted to the district court for such actions as may be required to implement the foregoing.