In re Max FRANKEL, Debtor.

Barbara BALABER–STRAUSS, as
Trustee of the Estate of Max
Frankel, Plaintiff,

v.

Joseph MARKOWITZ, Defendant.

Bankruptcy No. 93–B–21371 (ASH).
Adv. No. 95–5103A.

United States Bankruptcy Court,
S.D. New York.

Oct. 16, 1995.

Serchuk & Zelermyer, L.L.P. by Benjamin Zelermyer, White Plains, NY, Special Litigation Counsel to the trustee.

Farber, Segall & Pappalardo by Eugene I. Farber, White Plains, NY, for defendant.

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Plaintiff, Barbara Balaber–Strauss as Trustee of the debtor's estate ("Trustee"), commenced this adversary proceeding seeking specific performance and other relief against defendant Joseph Markowitz ("Defendant"), based upon Defendant's breach of his contractual obligation to purchase real property arising from his winning bid at a

trustee's auction on November 17, 1994. Defendant asserted affirmative defenses and a counterclaim to recover his downpayment. After expedited discovery, the matter was tried on August 23, 24 and 25. Having carefully considered the evidence and the parties' trial and post-trial submissions,[1] I have concluded that the Trustee is entitled to specific performance. The following constitute this Court's findings of fact and conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. *See, Saint Clare's Hospital and Health Center v. Insurance Company of North America (In re Saint Clare's Hospital and Health Center)*, 934 F.2d 15, 17 (2d Cir.1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964)).

### *Facts*

#### *The Events*

Among the debtor's assets to be liquidated in this Chapter 7 case were two contiguous parcels of real estate in Spring Valley, New York, known as 21 Alturas Road (also known as 290 Route 59) and 3 West Street. The subject of this proceeding, 21 Alturas Road, comprised an improved lot with a large residential-style house surrounded by trees and lawn, and an adjoining vacant lot. The adjacent property, 3 West Street, was described as a two-family house. At all relevant times the 21 Alturas Road house was divided into and had been rented as professional offices. A commercial sign in front of the building at the time of the auction identified some seven tenants, including three doctors, a mortgage broker and an executive counselling and mediation service.

In late October 1994 the Trustee filed a Notice of Intent to Sell the two parcels in question and subsequently obtained orders of this Court to sell the properties at public auction and to retain the services of an auctioneer. The auctioneer placed an advertisement in *The New York · Times* and West-

---

1. By letter dated September 8, 1995, Defendant's attorney stated that he would not make any further post-trial submission on behalf of Defendant.

chester/Rockland Gannett newspapers on October 30, November 6 and November 13 which listed 21 Alturas Road under the legend "COMMERCIAL PROPERTY—Office Building" and showed inspection times on Sundays, November 6 and November 13. Defendant personally inspected the property at 21 Alturas Road and met with the auctioneer and the debtor on one of those inspection dates. Defendant was familiar with the neighborhood, having previously made many visits to his doctor's office located directly across the street from 21 Alturas Road.

At the time of the auction Defendant was and had been a licensed real estate broker for four or five years. He conducted his real estate business under the tradename "Best Mark Realty" from an office located in his home at 9 Sunrise Drive, Monsey, New York. Defendant has significant experience in the real estate business, going back twenty years or more as an investor in properties in New York City and elsewhere. He had previously attended real estate auctions.

The public auction was held on November 17, 1994 in front of the house at 21 Alturas Road. Approximately 30 to 35 persons attended the auction. There was a sign-in sheet, but relatively few of those in attendance bothered to sign it. At the outset of the auction, the auctioneer read a typewritten, prepared statement in a loud, clear voice, which he demonstrated at the trial, which was clearly audible to and heard by Defendant. The following are excerpts from the statement:

- "The auction is subject to [the Trustee's] confirmation and entry of a bankruptcy order confirming sale or sales. The Trustee reserves the right to reject any and all bids."
- "The properties are sold as-is, with no guarantee or warranty expressed or implied."
- ". . . closing which is to be within 30 days after entry of the court order."
- "Do not bid on these properties if you do not possess the necessary amount of mo-

nies to close. The sales are not contingent upon financing."

Immediately after this statement was read, four separate auctions took place. In accordance with the statement, both 21 Alturas Road and 3 West Street were initially auctioned collectively as a package. Defendant's bid of $350,000 for both properties was accepted as the high bid. The auctioneer then separately auctioned 3 West Street, followed by 21 Alturas Road. The 3 West Street property was auctioned twice because the first auction was nullified when the high bidder did not produce a certified or bank check for the downpayment. The high bid on 3 West Street was $100,000.[2] The auction of 21 Alturas Road followed immediately after that of 3 West Street. The bidding opened at $200,000 and proceeded through bids announced by the auctioneer of $220,000, $225,000, $230,000, $235,000, $250,000 and Defendant's winning bid of $275,000.

Two issues of fact were raised at the trial concerning the auction of 21 Alturas Road. First, the auctioneer testified that the $250,000 bid was signified by the bidder by means of a hand signal, rather than audibly. While expressly disclaiming any charge that the auctioneer intentionally fabricated a non-existent bid, counsel for Defendant argued that the auctioneer was mistaken in announcing the $250,000 bid. Absent any evidence to support a finding of mistake, and based upon the auctioneer's impeccable credentials as auctioneer of choice for bankruptcy trustees and other public officials and agencies, his professional experience in countless auctions over a period of many years and the evident candor and reliability of his testimony, I find as a fact that the auctioneer acted in good faith in reporting a $250,000 bid based on a hand signal perceived by him during the auction.

The second point of dispute related to bidding increments. The Trustee and the auctioneer testified that at no time did the auctioneer require that bidding proceed by increments in any amount. Another wit-

---

2. The closing on 3 West Street took place shortly after the December 14 Court order approving the sales.

ness who was a bidder at the auction (Dr. Wurzburger) testified at his deposition read at trial that he had no recollection of any announcement of bidding increments. However, Defendant testified at the trial and another witness (Mr. Klein) testified in his deposition read at trial that after announcing the $250,000 bid the auctioneer stated that any further bids should be in increments of $25,000. While I conclude that this issue of fact has no legal significance, based on the weight of the credible evidence I find that Defendant and Mr. Klein were mistaken in their testimony and that the auctioneer did not impose a requirement of $25,000 bidding increments. No such claim is made by Defendant with respect to the other three auctions. The auctioneer testified quite credibly that he had no reason to impose the alleged requirement of a $25,000 bidding increment and, to the contrary, that he would have been pleased to accept any increment in excess of the $250,000 bid, as he had accepted the prior bids. Moreover, Defendant never complained of or even mentioned the point to anyone in any context until after commencement of this adversary proceeding.

Each of the four auctions was conducted rapidly, requiring five minutes or less, and each auction followed the other promptly.

Immediately after acceptance of his $275,000 bid, Defendant delivered to the Trustee two certified checks totalling $28,000 and signed and delivered to the Trustee a Memorandum of Sale dated November 17 evidencing the selling price, $275,000, the deposit of $28,000 and the balance due in full at closing of $247,000. The Memorandum of Sale contained the following language:

- "BUILDING AND PROPERTY IS SOLD AS–IS, NO GUARANTEES OR WARRANTY EXPRESSED OR IMPLIED."

- "... Closing to be held within THIRTY (30) days after entry of a Federal Bankruptcy Court Order."

- "PURCHASER(S) IS RESPONSIBLE FOR OBTAINING OWN FINANCING. DEPOSIT IS REFUNDABLE ONLY IN THE EVENT THAT THE SALE IS NOT CONFIRMED EITHER BY THE TRUSTEE OR THE COURT...."

On November 30, 1994 the Trustee caused to be served a "NOTICE OF PRESENTMENT OF ORDER AND OF OPPORTUNITY TO BE HEARD" reciting that an order in the form attached to the Notice confirming the sales at the November 17 auction would be presented to the Court on December 8. This Notice was served on Defendant, among others. The "Order Confirming Sales", which was duly signed by this Court on December 14, confirmed and approved the sale to Defendant for $275,000 upon the terms set forth in the Notice of Sale and the Memorandum of Sale signed by Defendant on November 17, copies of both of which were attached to the application which was served with the Notice on Defendant on November 30. The Notice of Sale recited that "the Real Properties are being sold 'AS–IS' and 'WHEREIS' without representations and/or warranties of any kind, nature or description, by the Trustee, the Auctioneer, and/or their agents except as may be expressly stated herein." The Order stated in its final decretal paragraph that "the closing of the Sales shall take place within thirty (30) days after the entry of this Order becomes final in all respects...." Defendant made no objection to the proposed Order Confirming Sales, did not appear at the hearing held on the Trustee's application on December 8, 1994 and did not appeal from the Order after it was signed by the Court and docketed.

On December 15, 1994 the Trustee wrote to Defendant enclosing the Order Confirming Sales and requesting that Defendant contact the Trustee's office to arrange a closing. Receiving no response, the Trustee wrote Defendant again on January 5. On January 23, 1995 the Trustee received a telephone call from Eugene Farber, Esq., the attorney representing Defendant in this proceeding, who stated that he represented Defendant and requested copies of the Order authorizing the sale and the Order Confirming Sales. The same day the Trustee wrote to Mr. Farber forwarding the requested Orders and requesting a call to discuss a closing date. Receiving no response, the Trustee wrote Mr. Farber on February 2 "regarding the

breach of contract of Mr. Moskowitz [sic] in closing on the sale of Alturas Drive [sic]" and stating "I am preparing to file a motion in Bankruptcy Court regarding same. Please contact me immediately." The following day, February 3, Mr. Farber wrote to the Trustee responding to her letter of February 2 stating that Defendant "has obtained a verbal commitment from Green Point Savings Bank . . . for $125,000.00 and Mr. Markowitz has access to the balance of the funds necessary to close his acquisition of the subject property." Mr. Farber stated that "Mr. Markowitz is ready, willing and able to proceed to closing" and he expressed the "hope that you do not proceed with any motion." At the trial Defendant testified that he knew of the contents of this letter and approved and authorized it. Nevertheless, Defendant and his counsel still did not arrange a closing, despite letters from the Trustee to Mr. Farber dated February 17 and March 14.

On March 30 the Trustee served and filed a motion seeking an order declaring Defendant in default, authorizing resale of the property and awarding the Trustee the Defendant's deposit of $28,000 as liquidated damages. Defendant cross-moved for an order declaring the auction null and void and directing the return of his deposit. The motion practice was mooted by the commencement of this adversary proceeding on May 31.

Although he has declined to proceed with the purchase of 21 Alturas Road, there was evidence at the trial substantiating the fact that at some time after the auction on November 17, 1994 and continuing through some time in August 1995 Defendant used the 21 Alturas Road property for an office for his real estate business. Defendant caused a sign bearing the name under which he conducts his real estate business, Best Mark Realty, to be posted on the front door of the house. Defendant caused two telephone lines to be installed at 21 Alturas Road, one of which was answered in the name of Best Mark Realty and the other was used for a fax machine. Computer/word processing equipment was observed in the premises and it seems unlikely that this equipment was the property of the debtor, whom

the evidence showed to be an impoverished and unemployed former doctor residing in the house at the sufferance of the Trustee upon his release from prison after serving a sentence for Medicaid fraud, who did not have sufficient resources to pay for water to be turned on at the premises. In early May 1995 Defendant caused his son to file an "Application for Water Service" with the Spring Valley Water Company which listed as the customer Best Mark Realty with its business address at 290 Route 59, the alternate address for 21 Alturas Road. A check for $1,000 was delivered by Best Mark Realty to the water company as a deposit for this application, and shortly thereafter a fax was sent to the water company attaching a copy of the Memorandum of Sale signed by Defendant for the property immediately after the auction as evidence of the status of Best Mark Realty as owner/customer.

The stark inconsistency between the foregoing evidence of Defendant's use of 21 Alturas Road and Defendant's attempt to renege on his auction bid and contract in this adversary proceeding was explained by Defendant's utterly implausible assertion that he was not conducting business at 21 Alturas Road but merely helping the debtor (a complete stranger) to rehabilitate himself by teaching him a new career in real estate.

### The Pleadings; Trial Contentions

This adversary proceeding was commenced by complaint dated May 31, 1995. The complaint demands that Defendant be compelled to specifically perform his agreement to purchase 21 Alturas Road at the contract price of $275,000. In the alternative, the Trustee seeks forfeiture of Defendant's $28,000 deposit, damages representing the difference between the ultimate sale price in a subsequent auction and Defendant's contract price, an order providing for Defendant's ejectment from the property and rent for Defendant's use of the property.

Defendant's answer contains denials and asserts an affirmative defense and counterclaim to recover Defendant's deposit. The affirmative defense and counterclaim allege that the Trustee and the auctioneer represented (a) that the property was zoned for commercial use and (b) that the auction bid

immediately preceding Defendant's bid was $250,000 and that only $25,000 increments would be accepted, and that these representations were material, false and were relied upon by Defendant. At the trial, Defendant advanced a number of contentions with respect to the advertisement for the sale placed in newspapers by the auctioneer, and the conduct of the sale. Each of these contentions will be examined.

Defendant argues that the auctioneer's newspaper advertisement violated local Rule 42 of this Court in a number of respects, including the alleged failure to include the place of the auction, the address and telephone number of the Trustee and the "as-is" condition of the terms of sale. The first two alleged omissions are so palpably trivial and inconsequential to the Defendant as to require no comment.

The "as-is" term of sale was certainly an important condition, but its omission from the advertisement cannot be complained of by Defendant in the circumstances here present: (i) the statement read by the auctioneer in a loud voice immediately prior to the auction, which was concededly heard by Defendant, stated "The properties are sold as-is, with no guarantee or warranty expressed or implied"; (ii) the Memorandum of Sale signed by Defendant immediately after the auction contained the legend in capital letters "BUILDING AND PROPERTY IS SOLD AS–IS, NO GUARANTEES OR WARRANTY EXPRESSED OR IMPLIED"; and (iii) the Notice of Sale, which was annexed to the "NOTICE OF PRESENTMENT OF ORDER AND OF OPPORTUNITY TO BE HEARD" served on Defendant prior to the hearing on the Trustee's application to confirm the sale, recited that "the Real Properties are being sold 'AS–IS' and 'WHEREIS' without representations and/or warranties of any kind, nature or description, by the Trustee, the Auctioneer, and/or their agents except as may be expressly stated herein." Defendant was clearly and unambiguously forewarned of the "as-is" condition of the terms of sale prior to bidding and again prior to signing the purchase agreement, and he received further notice of this condition in the Notice of Sale which he received in ample

time to object to confirmation of the sale at the December 8 hearing.

■ Defendant's principal plaint with respect to the auctioneer's advertisement is the legend "COMMERCIAL PROPERTY—Office Building" which appears as a description over the reference to 21 Alturas Road. It is alleged that the word "COMMERCIAL" was a misrepresentation because the zoning governing the property does not permit the erection of stores. Defendant's objection to the word "COMMERCIAL" in the advertisement is groundless for several reasons. First, as noted just above, Defendant was clearly and unmistakably put on notice that the property was sold "as-is, with no guarantee or warranty expressed or implied" before the auction, before he signed the Memorandum of Sale, before he delivered his deposit of $28,000 and before the December 8 hearing to confirm the sale. Accordingly, even if the use of the word "COMMERCIAL" in the advertisement constituted a misrepresentation, Defendant could not be held to have relied upon it as a matter of law. *See In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 343 (Bankr.E.D.N.Y.1993) ("[The purchaser's] argument fails because the 'Terms and Conditions of Sale' explicitly provided that the property was to be sold 'as is'. The doctrine of caveat emptor applies to bankruptcy sales"); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 936 (Bankr.E.D.N.Y.1981) ("the conditions of a public sale, announced at the time and place of the sale, are binding on the purchaser"). The terms of sale announced at the sale and in the notice of sale govern the auction and are binding on all bidders, even if the person buying at the auction did not hear the terms of sale. *In re Wilson Freight Co.*, 30 B.R. 971, 975 (Bankr.S.D.N.Y.1983) ("the terms and conditions of the sale announced by [the auctioneer and the debtor's attorney] were binding on [the high bidder] regardless of whether its bidder … knew or heard them"); *Burling v. Brinn*, 116 Misc. 130, 132, 189 N.Y.S. 707 (App.Term, 2d Dep't 1921); *Matter of Premier Container Corp.*, 95 Misc.2d 859, 866, 408 N.Y.S.2d 725 (Sup. Ct. Queens Co.1978); *Graham v. Healy*, 154 A.D. 76, 80–81, 138 N.Y.S. 611 (1st Dep't 1912).

Second, the use of the word "COMMER-CIAL" in the advertisement did not constitute a misrepresentation. There is nothing in the zoning law which defines the word "commercial" or equates that term with stores. In common parlance in the context of real estate, the word "commercial" (as distinguished from "residential") denotes some form of business or professional activity, and there is no doubt that 21 Alturas Road was zoned and used for such activity. It was, as described in the advertisement, an "Office Building". Absent any evidence that the term "commercial" was used solely in the sense of merchandising or storefront activity either by statute, regulation or convention, there is no basis for a finding that the advertisement was false or misleading in any respect.

Finally, Defendant's alleged "reliance" on the word "commercial" as connoting a zoning status permitting the erection of stores is not credible on the evidence adduced at trial. Defendant was fully familiar with the neighborhood and he knew that there was no storefront merchandising in the neighborhood. It defies credulity that a person with Defendant's long experience in the real estate business would make a substantial real estate investment predicated on a zoning status at variance with the existing usage of the building, solely in reliance on an advertisement that did not mention zoning, without exercising the simple due diligence of checking with the local zoning office. Defendant made considerable efforts to obtain partial financing (including consultation with a mortgage broker who was a tenant of 21 Alturas Road). He authorized his attorney to write to the Trustee declaring that he was ready, willing and able to purchase the property. But he manifested no interest in ascertaining whether the zoning would permit a usage of the property which was demonstrably at variance with any usage in the neighborhood. Instead, he proceeded to make use of the property for professional office space for his own real estate business. In short, Defendant's assertion that he relied on the advertisement as a representation that the property was zoned for the erection of stores conflicts with the objective evidence and is unworthy of belief.

■ The other prong of Defendant's affirmative defense and counterclaim is his attack upon the auction itself. One contention is that the auctioneer mistakenly announced a bid of $250,000 based on a hand signal. A second contention is that the auctioneer imposed bidding increments of $25,000 during the auction. Both of these arguments have been considered above and rejected. It was also asserted by Defendant in his testimony and by counsel that the auction of 21 Alturas Road was marked by "confusion" in that one of the bidders, Dr. Wurzburger, and his secretary were apparently bidding against each other, resulting in some remonstration or dialogue between the two and, further, that after the $250,000 bid (or perhaps an earlier bid) Dr. Wurzburger, fearing that the auctioneer had attributed that bid to him, called out that there was a mistake and the bid was not his, to which the auctioneer responded in words or substance that he already had the bid in question from another bidder. These distractions, combined with the alleged imposition of incremental bidding and the lack of an audible bid for $250,000 from the floor, are the basis for Defendant's argument that the auction was so confused as to mandate an order nullifying it. The argument is untenable both factually and legally.

Assuming the "confusion" during the auction to have been as described by Defendant, and further assuming that the auctioneer had imposed $25,000 bidding increments, the fact remains that Defendant was under no compulsion to bid any amount. Whether he bid and what he bid were solely within Defendant's control. Whether the amount of Defendant's bid was a product of his belief that the auctioneer had imposed such an increment or was simply a bidding strategy designed to discourage further competition by others is irrelevant, because Defendant was under no compulsion to bid at all. He could have bid $255,000 despite the auctioneer's imposition of a $25,000 increment, in which event the only consequence would have been that the auctioneer would have either accepted the bid or rejected it, which the auctioneer and Trustee were free to do under the announced terms of sale in any event.

Moreover, one must question the adverse impact on Defendant of the alleged "confusion" in view of the fact that Defendant made no mention of it until after commencement of this litigation. Viewed objectively, it is not to be believed that a person feeling genuinely aggrieved by events during an auction would proceed to make the winning bid, sign a Memorandum of Sale, deliver $28,000 in certified checks and fail to register any objection when given the opportunity to do so prior to judicial confirmation of the sale.

### Law

■ Public policy considerations favoring the finality of judicial sales mandate rejection of Defendant's contentions with respect to the conduct of the auction. *See In the Matter of Baudoin; Bank of Lafayette v. Baudoin,* 981 F.2d 736, (5th Cir.1993) ("[o]ur precedent clearly establishes that bankruptcy court orders authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes" (emphasis in the original); *In re Barker,* 768 F.2d 191, 193 (7th Cir.1985) ("[o]rders approving or failing to approve a sale of debtor's property are considered final decisions and are immediately appealable"). Thus, a purchaser at a bankruptcy auction sale may not collaterally attack the validity of the sale. In *In re Oyster Bay Cove, Ltd., supra,* 161 B.R. at 342, the Court said:

> It is well settled that an Order of Sale by the Bankruptcy Court cannot be collaterally attacked. *In the Matter of Garfinkle,* 672 F.2d 1340, 1348 (11th Cir.1982) (citing, *Slocum v. Edwards,* 168 F.2d 627 (2d Cir. 1948), 4(b) *Collier on Bankruptcy* 70.98(18) (14th Ed.1978). *See also, In re Met–L–Wood Corp.,* 861 F.2d 1012 (7th Cir.1988) *cert. denied, Gekas v. Pipin,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). This general rule has been applied to preclude purchasers whose bids have been accepted and authorized by the Bankruptcy Court from reneging on their obligations to consummate the purchase as authorized at a judicial sale.

The purchaser at an auction may assert his objections to the conduct of the auction by opposing the trustee's application to confirm the sale or moving to set aside the order confirming the sale pursuant to Rule 60 of the Federal Rules of Civil Procedure (Bankruptcy Rule 9024) in an appropriate case, and by appealing the order confirming the sale if unsuccessful in either of these procedures. But he may not ignore the procedures for redress provided by the governing Rules and, months later, assert objections seeking to upset a final, non-appealable order. *See In re Charlton,* 708 F.2d 1449, 1454–55 (9th Cir.1983) ("[a]fter the sale of the property occurs, the merits of the orders approving the sale are no longer in issue ... nor may the ... validity of the sale of the deed (be attacked) in [the] appeal."); *see also In Re Lewis Jones, Inc.,* 369 F.Supp. 111, 118 (E.D.Pa.1973) (citing *Slocum v. Edwards,* 168 F.2d 627 (2d Cir.1948)) ("[t]he finality of a Bankruptcy Court sale is not subject to inquiry or impeachment in any collateral proceeding").

■ While a bankruptcy court has broad initial discretion in granting or denying confirmation of a sale, the court should vacate an order confirming a sale only in limited circumstances of compelling equity. *In re WPRV–TV, Inc.,* 983 F.2d 336, 340 (1st Cir. 1993); *Matter of Chung King, Inc.,* 753 F.2d 547, 549 (7th Cir.1985). In *In re M & M Transportation Co.,* 13 B.R. 861, 867 (Bankr. S.D.N.Y.1981), the court articulated the controlling policy:

> The first legal issue raised in these disputes concerns the reach of the power of this court to set aside a previously confirmed judicial sale. Plaintiffs correctly point to the general policy of the bankruptcy courts to uphold regularly conducted sales so as to engender and maintain their stability and the integrity of the process, 4B *Collier on Bankruptcy* (14th ed.) ¶ 70.98, for it is the "policy of the law to maintain judicial sales and every reasonable inducement [sic] will be indulged to uphold them." *Manson v. Duncanson,* 166 U.S. 533, 17 S.Ct. 647, 41 L.Ed. 1105 (1897).

The limitations on the court's power to vacate a prior order confirming a sale are grounded in the principle of finality. As the

court stated in *In re WPRV–TV, Inc., supra,* 983 F.2d at 341,

> Such limited discretion is necessary, because " '[i]f parties are to be encouraged to bid at judicial sales there must be stability and a time must come when a fair bid is accepted and the proceedings are ended.' " *Id.* (quoting *In re Webcor,* 392 F.2d 893, 899 (7th Cir.), *cert. denied,* 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968)). "This policy of finality protects confirmed sales unless compelling equities outweigh the interests in finality." *Id.* at 550.

Only fundamental errors or compelling equities arising out of fraud, mistake or like infirmity, such as defective notice to interested parties of the sale or "grossly inadequate" sales price, justify setting aside a confirmed sale. *See Matter of Chung King, Inc., supra,* 753 F.2d at 550–52. "[V]acating ... a sale because of minor errors would amount to an abuse of discretion." *Id.*

Applying these principles to the facts in this case mandates judgment in favor of the Trustee. Indeed, the analysis set forth above demonstrates that Defendant's contentions with respect to the auction would be unsustainable even if asserted timely at the hearing on December 8, 1994 on the Trustee's motion to confirm the sale. To hold that a winning bidder who signs a Memorandum of Sale and delivers certified checks for his deposit could successfully oppose confirmation of the sale and recover his deposit by complaining of matters which were manifest and known to him at the time of the auction would set a precedent gravely undermining the auction process. To permit such claims to succeed when first asserted months after the order confirming the sale became final and non-appealable is unthinkable as a matter of public policy even if the buyer's complaints were of sufficient substance to warrant withholding confirmation of the sale if timely asserted.

### Relief

Defendant opposes the remedy of specific performance, asserting (Pretrial Mem. at 15):

> Markowitz certainly does not desire to buy the property, since he has learned that it is not truly commercial space. There is

simply no reason to force him to own the property when it can be readily resold at public auction. The remedy of specific performance should be denied.

More specifically, Defendant points out that the Memorandum of Sale dated November 17, 1994 says nothing about specific performance and, "to the contrary", states that the $28,000 deposit shall be considered liquidated damages if Defendant did not close the sale. Defendant's principal contention is that under basic principles of equity jurisprudence the Court should not grant an equitable remedy if the Trustee has an adequate remedy at law, citing 71 Am.Jur.2d, Specific Performance, Section 8, page 20.

The law in New York is clear that a seller is entitled to the remedy of specific performance if the purchaser breaches a contract to purchase real estate. Setting forth the elements of a claim for specific performance under New York law, the District Court in *La Mirada Products Co. v. Wassall PLC,* 823 F.Supp. 138, 140 (S.D.N.Y.1993) said:

> Under New York law, which applies here, a party can be compelled to perform its contractual obligations if (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law.

There is no question that under New York law the seller, as well as the purchaser, of real property is entitled to specific performance. *See Woodruff v. Germansky,* 233 N.Y. 365, 369, 135 N.E. 601 (1922); *Crary v. Smith,* 2 N.Y. 60 (1848); *Morgan and Brother Manhattan Storage Company, Inc. v. Balin,* 47 A.D.2d 85, 89, 364 N.Y.S.2d 904 (1st Dep't 1975), *aff'd,* 39 N.Y.2d 848, 386 N.Y.S.2d 100, 351 N.E.2d 748 (1976).

Turning to the elements for specific performance articulated in *La Mirada Products Co. v. Wassall PLC, supra,* there is no question that (1) there is a valid contract and (2) the Trustee has substantially performed and is willing and able to perform her remaining obligations. As to (3) it is also

undisputed that Defendant "is able to perform [his] obligations" under the contract. The letter dated February 3, 1995 to the Trustee from Defendant's counsel, authorized by Defendant, stated that Defendant had obtained financing and that he was ready, willing and able to perform. Defendant testified in his deposition, read at trial, that he could obtain whatever funds were needed to buy the property, and he testified unequivocally at trial that he would have no difficulty in obtaining whatever funds were necessary to close the transaction.

There are two basic points to be made with regard to element (4) and Defendant's contention that the Trustee has an adequate remedy at law. First, it is by no means clear that the courts of New York require a finding that the vendor has no adequate remedy at law in the case of breach of a sale of real estate. For example, in *Crary v. Smith, supra*, 2 N.Y. at 62, in affirming a decree of specific performance in favor of the vendor of real property even though the vendor had an adequate remedy at law, the Court of Appeals said that the vendor "has a choice of remedies. He may resort either to a court of law or a court of equity." In *Morgan and Brother Manhattan Storage Company, Inc. v. Balin, supra*, 47 A.D.2d at 89, 364 N.Y.S.2d 904, which was affirmed by the Court of Appeals, the Appellate Division stated that inadequacy of the remedy at law was just one alternative ground for seeking specific performance:

> A vendor may be entitled to specific performance on the theory of inadequacy of the remedy at law (Restatement, Contracts, § 360; *Woodruff v. Germansky*, 233 N.Y. 365, 369 [135 N.E. 601]; *Kroll v. Zimmerman*, 274 App.Div. 1070 [85 N.Y.S.2d 642]); that the ends of justice would so best be served (cf. 5A Corbin, Contracts, § 1136); or under a theory of mutuality of remedy (cf. 5A Corbin, Contracts, § 1136; *Baumann v. Pinckney*, 118 N.Y. 604 [23 N.E. 916]).

A more recent decision on point is *Oneida City School District v. Seiden & Sons, Inc.*, 177 A.D.2d 828, 576 N.Y.S.2d 442 (3d Dep't 1991), where the court affirmed specific performance in favor of a vendor of real estate "[a]lthough plaintiff may have a remedy in the form of money damages for defendant's breach of contract ..." (177 A.D.2d at 830, 576 N.Y.S.2d 442). In language strikingly appropriate for this case, the Appellate Division stated:

> It is apparent that defendant, an experienced real estate developer, has had second thoughts about the wisdom of its business judgment which prompted the offer to purchase plaintiff's property and seeks to be relieved from what it now views as an unprofitable bargain. *Id.*

Even if the Trustee were required to demonstrate that she does not have an adequate remedy at law, that requirement is satisfied in this case. First of all, it is doubtful that the conditions of any public auction can be duplicated. Real estate is unique and bears no resemblance to a fungible commodity which can be traded in a predictable public market. In this particular case, the Trustee correctly points out that at least two specific factors affecting the November 17, 1994 auction will be different in any subsequent sale of the property, one being the fact that on November 17 the 21 Alturas Road property was offered in conjunction with a contiguous parcel of real estate, and the other being the "To Whom it May Concern" letter on the purported letterhead of the Rabbinical Court of Mechon Hahoyroa, which was evidently distributed at or about the time of the November 17 auction with the apparent objective of influencing an important category of potential purchasers for the property not to bid at the auction.[3] Of course, market conditions at the time of a second auction may be more, or less, favorable to the seller than those prevailing on November 17. But it is certain that the conditions will be different, and the risk should be borne by the default-

---

**3.** The purported letter of the Rabbinical Court written in Hebrew (Pl.Ex. 5A) was translated as follows by the Bergen Language Institute Inc. (Pl.Ex. 5B): "We hereby announce publicly that since the civil legal channels are selling the assets of the Illustrious Mr. Meir Frankel, and he has appointed an agent to buy on his behalf, therefore, may it be known that whoever is not a creditor and purchases there, the Illustrious Mr. Meir has the right to sue in a Torah trial, as explained by the religious legal authorities."

ing purchaser, Defendant, rather than the Trustee. Nor should the Trustee be required to suffer the nuisance, cost and delay attendant upon yet another auction of the property, particularly when one considers that any prospective purchaser might engage in the same tactics of delay and ultimate breach as the Defendant in this case.

Finally, Defendant's own position on the question of liquidated, as opposed to actual, damages is fatal to Defendant's opposition to the remedy of specific performance. At a subsequent auction, the property may be sold at an amount substantially less than $28,000 below Defendant's contract obligation to pay $275,000. In this event, it is Defendant's position asserted in his trial memorandum and unequivocally reaffirmed by counsel in closing argument that Defendant's obligation to the Trustee is limited to his $28,000 deposit, and any additional loss is for the Trustee's account. Based on this view, the Trustee obviously does not have an adequate remedy at law.

There is an additional reason for granting the Trustee's motion for an order requiring Defendant to purchase the property. In this case we are not dealing merely with the breach of a contract between private parties. The contract here was confirmed and approved by an order of this Court dated December 14, 1994. That order stated in its final decretal paragraph:

> ORDERED, that the closing of the Sales *shall take place* within thirty (30) days after the entry of this Order becomes final in all respects, or within such additional time as the Court, for cause, approves. . . .

Defendant thus stands in breach and violation of a final and non-appealable order of this Court. The Trustee is entitled to an order compelling Defendant to comply with his obligations under the December 14, 1994 order of this Court on pain of contempt, regardless of the Trustee's entitlement to the common law contractual remedy of specific performance.

■ Defendant's use and occupancy of 21 Alturas Road for his real estate business does not justify an award of compensation to the Trustee in the form of rent in view of the foregoing decision granting specific perfor-

mance. However, the Trustee will be entitled to an award of interest at the statutory rate on the unpaid balance of the purchase price commencing on the putative closing date called for in this Court's order dated December 14, 1994. In addition, the Trustee will be entitled to recover all costs incurred by the estate associated with the maintenance and continued ownership of the property subsequent to the putative closing date, including real estate taxes paid, through the final date of closing in accordance with the order entered following this decision.

■ Defendant's conduct in appropriating the property at 21 Alturas Road for his own use subsequent to the November 17 auction, his declaration through counsel that he was ready, willing and able to purchase the property, his refusal to comply with his obligation under contract and under this Court's order to complete his purchase of the property, his continued use of the property even after the initiation of motion practice and this adversary proceeding, his testimony at the trial which this Court has found unworthy of belief and his failure to offer any colorable or credible justification for refusing to comply with his contractual and Court-ordered obligation merits the imposition of sanctions. The Trustee has been required to expend substantial amounts in legal fees in the prosecution of this adversary proceeding. The costs so incurred should not be borne by the creditors of this estate. This was not an ordinary breach of contract action subject to the normal "American rule" under which each side bears its own legal costs. Departure from the American rule is warranted by reason of (i) Defendant's willful failure to comply with an order of this Court, *In re Village Craftsman, Inc.,* 160 B.R. 740, 748 (Bankr.D.N.J.1993) (in holding a party in civil contempt of a court order, the court found that the party's willful noncompliance with the court order warranted sanctions); *In re Chase & Sanborn Corp. (Granfinanciera v. Nordberg),* 872 F.2d 397, 400–01 (11th Cir.1989) (Civil contempt sanctions are imposed to coerce compliance with Court orders and to compensate the party who suffers because of the contemnor's behavior); *In re Shafer,* 63 B.R. 194, 198 (Bankr.D.Kan.

1986) (citing *Perry v. O'Donnell*, 759 F.2d 702 (9th Cir.1985)) (If an individual has knowledge of a court order, "[a]ccidental, inadvertent or negligent conduct can be grounds for imposing civil contempt sanctions, and those sanctions may include attorneys fees"); *In re Patterson*, 111 B.R. 395, 398 (Bankr.N.D.N.Y.1989) (debtors held in civil contempt for violation of court order directing debtors to file certain documents with the court) and (ii) Defendant's lack of good faith and lack of candor in his defense of this adversary proceeding. *See In re Costello*, 176 B.R. 592, 595 (Bankr.M.D.Fla.1994) where the court stated:

> Whether or not a federal court has the inherent power to impose sanctions was answered by *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) where the Supreme Court, Judge White speaking for the Court, held that (1) the federal court has inherent power to assess attorneys fees as a sanction for a party's bad faith conduct in the course of litigation; and (2) its inherent power is not displaced by the sanctioning scheme of 28 U.S.C. § 1927 and the various sanctioning provisions of the Federal Rules of Civil Procedure. There is no justification not to apply the same principles to proceedings before the Bankruptcy Court where the bad faith conduct could be just as egregious as in the District Court, as demonstrated in the present instance.

*See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27, 45 (1991) ("a court may assess attorney's fees when a party has ' "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" ' " ) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). *See also Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, n. 4, 88 S.Ct. 964, 966, n. 4, 19 L.Ed.2d 1263, 88 S.Ct. 964 (1968) (per curiam); *In re Gioioso (Stuebben v. Gioioso)*, 979 F.2d 956, 960 (3d Cir.1992) (court concluded "that bankruptcy court abused its discretion by refusing to impose sanctions against debtors ... [where] the court found in its opinion that the debtors in

fact falsified certifications, a violation of Rule 9011"); *Matter of Studio Camera Supply, Inc.*, 116 B.R. 70, 73–74 (E.D.Mich.1990) (court held sanctions were appropriate where false and misleading petition was filed with the bankruptcy court).

 Bankruptcy Rule of Procedure 9011 provides: "If a document is signed in violation of this rule, the court on motion or on its own initiative, shall ... impose appropriate sanction." Rule 9011 applies to every paper signed during the course of proceedings and not only to the pleadings. Although the Rule does not necessarily apply to the entire conduct of the proceedings, *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir.1986), Rule 9011 sanctions are warranted where "it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *Cross & Cross Properties v. Everett Allied Co.*, 886 F.2d 497, 504 (2d Cir.1989) citing *International Shipping Co. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.1989). See *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985) ("where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law"). In ruling on sanctions, the credibility of the testimony is crucial in determining whether doubts exist. *In re Mergenthaler*, 144 B.R. 632 (Bankr.E.D.N.Y. 1992) (sanctions imposed upon chapter 13 debtor based on evidence that debtor had filed chapter 13 petitions for purpose of frustrating judgment creditor's execution, debtor had filed affidavits containing false statements, and debtor's testimony was found to be unbelievable, including the fact that during his testimony the debtor maintained that the affidavit was true and accurate.)

Sanctions will be awarded against Defendant and counsel to be borne equally, and become part of the judgment.

### Conclusions

1. The Trustee's advertisement for the sale of 21 Alturas Road was not false or misleading as a matter of fact and law.

2. Among the terms and conditions of the auction sale on November 17, 1994 it was expressly stated that the sale was "as-is, without any guarantee or warranty expressed or implied" and Defendant received actual notice of said condition before the auction, after the auction and before he delivered his deposit and signed the Memorandum of Sale, and again before the December 8, 1994 hearing for confirmation of the sale. Accordingly, even if the auctioneer's advertisement had been false and misleading, Defendant would have been barred from relying thereon as a matter of law.

3. The auction of 21 Alturas Road on November 17, 1994 was fair and lawful. For the reasons stated above, the alleged defects in the auction complained of by Defendant were either unsubstantiated or inconsequential to Defendant as a matter of law and, in any event, Defendant waived any such defects by failing to assert them until long after this Court's order of December 14, 1994 confirming the sale had become final and no longer subject to appeal.

4. Defendant's winning bid of $275,000 for the property known as 21 Alturas Road and the Memorandum of Sale signed by the Trustee and by Defendant dated November 17, 1994 constituted a valid and binding contract for the purchase by Defendant of 21 Alturas Road, subject only to acceptance of Defendant's bid by the Trustee and approval and confirmation of the sale by the Court.

5. The Trustee signified her acceptance of Defendant's winning bid by signing the Memorandum of Sale and by submitting the sale to the Court for approval and confirmation.

6. This Court's order dated December 14, 1994 approving and confirming the sale is final and no longer subject to appeal and is binding on the Trustee as seller and Defendant as purchaser.

7. The Trustee is entitled to specific performance of Defendant's obligation to purchase 21 Alturas Road under the November 17, 1994 Memorandum of Sale. In addition, and irrespective of the contractual remedy of specific performance, the Trustee is entitled to an order compelling Defendant to comply with this Court's order dated December 14, 1994. The order to be entered in accordance with this decision shall provide for a closing within thirty days from the date of entry of said order.

8. The Trustee is entitled to interest on the unpaid balance of the purchase price from the date of the closing called for under this Court's order dated December 14, 1994 through the actual date of closing in accordance with this decision.

9. The Trustee is entitled to an award against Defendant and his counsel for the costs incurred by the Trustee, including reasonable legal fees to be approved by this Court, in prosecuting this adversary proceeding through judgment. Sanctions are based on the Court's conclusions with respect to the defendant's lack of good faith and candor in defense of this proceeding and counsel's violation of Bankruptcy Rule 9011.

10. All other relief sought by either party is denied.

Counsel for the Trustee will promptly settle, on one week's notice, an order and judgment consistent with this decision, leaving blank the amount of the attorneys' fees and other costs to be awarded against Defendant and his counsel as sanctions. Simultaneously with the notice of settlement, the Trustee's counsel will serve and file an appropriate application, returnable on the settlement date, for an award of counsel fees and expenses in accordance with the applicable rules. Any papers opposing the proposed order or the application for costs and attorneys' fees in connection with this proceeding shall be served and filed one day before the hearing date.